UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-CR-0014-CVE |
| | ) | |
| ALEX DEVON BRUMFIELD, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Before the Court are defendant Alex Devon Brumfield's motion to suppress (Dkt. # 23) and

plaintiff's response (Dkt. # 27). On January 18, 2022, a grand jury returned a four-count indictment

charging defendant with coercion and enticement of a minor (count 1); production of child

pornography (count 2); possession of child pornography (count 3); and sexual abuse of a minor in

Indian country (count 4). Dkt. # 16. Defendant requests that the Court "suppress the traffic stop

that began this case, and to suppress all evidence derived therefrom." Dkt. # 23, at 1.

**I.**

On December 31, 2021, Broken Arrow Police Department (BAPD) received a report of a

runaway 12-year-old girl, E.M. Dkt. # 27, at 1. At approximately 1:00 a.m., BAPD dispatched

officers Campbell and Tyson to E.M.'s residence. Id. After speaking to her parents, the officers

obtained consent from E.M.'s parents to search her phone and tablet, Id., which E.M. had left behind

in her room, Dkt. # 23, at 1. The officers' "search revealed conversations between E.M. and an

unknown man on Snapchat . . . [and] included a discussion of E.M.'s intent to sneak out and be

picked up by the man, and to engage in sexual activity with him." Dkt. # 27, at 1-2. The officers

"looked at photos of E.M. so they would know what she looked like if they found her." Id. at 2. Additionally, E.M.'s mother informed the officers that E.M. "regularly snuck out and would typically return [at] about 4:30 a.m." Id.

The officers monitored the residence for E.M.'s return, and each officer was stationed in a marked patrol car parked at opposite ends of the street where E.M's residence is located. Id. "At approximately 4:45 a.m., the officers saw a red Chevrolet Blazer driving slowly in front of E.M's house[,]" which "was situated in the middle of the block. The Blazer slowed, almost coming to a stop, then sped up and left the neighborhood." Id. The officers followed the car for approximately two miles, and then pulled it over. Id. At this point, Tyson activated his body worn camera, which recorded the encounter that lasted approximately one hour. Id.

When Tyson approached the vehicle, defendant was behind the wheel and "E.M. [was] sitting in the front passenger seat." Id. Tyson first asked defendant if he had any identification and to confirm his home address. Id. Without any further questions from Tyson, defendant stated that he did not have a license, he was driving his mom's car, he met E.M. online, and she told him that she was eighteen. Id. at 2-3. "Tyson then advised [defendant] to stop volunteering information when officers had not asked him any questions." Id. at 3. Campbell removed E.M. from the vehicle, and E.M. subsequently told Campbell that "she had sex with [defendant] earlier that night." Id.

Tyson placed defendant in his patrol car, without handcuffs, and read him his Miranda rights. Id. After receiving a Miranda warning, defendant voluntarily agreed to speak to Tyson. Id. During this conversation, defendant stated that "he picked up E.M. with the intent of having sex with her"; "he had known her for a few days, and they were talking online"; "he picked up E.M. at her house";

"he had sex with E.M. approximately three times in his bedroom at his house"; "he used Omegle[1] and Snapchat to communicate with E.M"; "he previously asked [E.M.] to send him sexually explicit photographs, and that these photographs were on his cell phone." Id.

Throughout the stop, the officers separately questioned E.M. and defendant, and then compared information from their interviews. Id. Over the course of the investigative stop, the officers discussed whether BAPD "had jurisdiction to arrest [defendant], given that the sexual acts occurred in Tulsa." Id. The officers discussed that "they needed to have a confirmed crime that occurred in Broken Arrow," which led them to further investigate into information they had gathered as to defendant possessing child pornography on his phone. Id. Tyson prepared a search consent form and asked defendant whether he would consent to a search of his phone for evidence of sexually explicit photos of E.M., which defendant had admitted to possessing earlier in the interrogation. Id. at 4. Defendant signed the search consent form, and the officers searched his phone and found multiple photographs of a girl, whom officers were able to confirm was E.M. based on photos they had seen on her phone and tablet. Id. Officers also found "messages between [defendant] and E.M. about their plans to have sex." Id. Following this discovery, officers arrested defendant "based on his possession of child pornography in Broken Arrow." Id. at 5.

## II.

Defendant argues that his Fourth Amendment rights were violated because "there was no observed traffic violation"; "[t]here was no other information that would justify a stop"; and the traffic stop was "not based upon any facts that would support reasonable particularized suspicion of

---

[1]     Omegle is an online chat platform that randomly pairs anonymous users "to talk one-on-one." See https://www.omegle.com/.

criminal activity[.]" Dkt. # 23, at 6.  Therefore, defendant argues, the seizure "is illegal under the

Fourth Amendment, [and] it must be suppressed."  Id.  Defendant further argues that because the

stop was illegal, "[a]ll statements and evidence that flow from this traffic stop must also be

suppressed" under the "fruit of the poisonous tree" doctrine.  Id.

Plaintiff responds that, based on "the totality of the circumstances," the officers had

reasonable suspicion to believe that "the girl, and the man she snuck out to meet, were in the Blazer."

Dkt. # 27, at 6.  Plaintiff further responds that "[r]egardless of whether [defendant] had any traffic

infractions, a brief investigatory stop of his Blazer was valid based on a particularized and objective

basis for suspecting him of criminal activity.  Id. at 7.  Finally, plaintiff responds that "the officers

would have discovered the same evidence [defendant] seeks to suppress through an independent,

lawful investigation of the cell phone data contained on [E.M.'s] phone."  Id. at 9.

The Court must consider whether the officers had a valid basis to initiate an investigative

detention of defendant's vehicle and whether the length of the detention was reasonable.  A traffic

stop is treated as an investigative detention, and such a stop is governed by the standards set forth

in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Bradford, 423 F.3d 1149,1156 (10th Cir.

2005).  In determining the reasonableness of a traffic stop, a court must make two separate inquiries.

The first is whether the police officer had a valid reason for initiating the traffic stop.  United States

v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). That is, an officer must have "a reasonable

suspicion supported by articulable facts that criminal activity may be afoot."  United States v.

Sokolow, 490 U.S. 1, 7 (1989).  In determining whether an officer had reasonable suspicion of

criminal activity, the Court does not evaluate the facts in isolation but instead construes them

together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002).

Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop.  United States v. Rice, 483 F.3d 1079,1083 (10th Cir. 2007).  A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion. United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." Alcaraz-Arellano, 441 F.3d at 1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).

For the first prong of the Terry analysis, the Court finds that the officers had a reasonable suspicion to initiate defendant's traffic stop.  Specifically, the officers were dispatched to E.M.'s residence in response to a report of a 12-year-old runaway.  After interviewing her parents, the officers obtained consent to search E.M.'s phone and tablet and discovered that she was exchanging messages with an unknown man, and discussed her intent to sneak out and have sex with him. Further, E.M.'s mother informed the officers that E.M. sneaks out often and usually returns home at around 4:30 a.m.  Accordingly, the officers were staking out E.M.'s street to monitor her return.

At approximately 4:45 a.m.--close to the time that E.M.'s mother predicted she would return--the officers observed a car drive down E.M.'s street, slow down almost to a stop in front of E.M.'s house, which is in the middle of the block, and then speed away. Based on the above articulable facts, the totality of the circumstances indicate that the officers had a reasonable suspicion to stop defendant's car.

For the second prong, the Court finds that the officers justifiably prolonged the investigative stop because they had an objectively reasonable and articulable suspicion that criminal activity was afoot and the stop was limited in scope to the purpose of the initial stop. Namely, as soon as the officers approached defendant's vehicle, they could identify E.M. sitting in the passenger seat. Further, after E.M. was removed from defendant's vehicle, she informed Campbell that she had sex with defendant earlier that night. While E.M. was with Campbell, defendant voluntarily consented to further questioning by Tyson, and told the officer that he had sex with E.M., and that he had sexually explicit photographs of her on his phone. Moreover, Tyson recorded the encounter, and the Court has reviewed the recording. In the recording, the officers discuss what articulable facts they have gleaned over the course of their investigation before and after the stop. The officers discussed defendant's admission of possessing child pornography on his phone, discussed the need to gather more evidence, and decided to ask defendant for his consent to search his phone for contraband, which ultimately led to his arrest. Additionally, the recording reveals that the length of detention after the initial stop had a close nexus to the purpose of the initial stop--prior to making the initial stop, the officers had discovered messages and photos on E.M.'s phone between her and an unknown man, including E.M.'s messages discussing her intent to have sex with him. During the stop, defendant voluntarily submitted to questioning and admitted that he had sexually explicit photos of

E.M. on his phone, which led to the officers' search of his phone.  Thus, the stop was not unnecessarily lengthy; rather, the officers used their "common sense and ordinary human experience," United States v. Sharpe, 470 U.S. 675, 685 (1985), to further investigate their reasonable suspicion that criminal activity was afoot.  Therefore, the Court finds that, based on the totality of the circumstances, the officers had a particularized and objective basis for the length of the stop based on their articulable need to investigate further into defendant's suspected criminal activity, the same suspected criminal activity that was the purpose of the initial stop.

In sum, the Court finds that the officers plainly had reasonable suspicion of criminal activity to justify the initial stop, as well as reasonable suspicion of ongoing criminal activity that would warrant an extension of the investigative detention.  Moreover, because the stop did not run afoul of the Fourth Amendment, suppressing the fruits of the search is not warranted on the basis of Fourth Amendment violations.  Therefore, the Court finds that defendant's motion to suppress should be denied.

**IT IS THEREFORE ORDERED** that defendant Alex Devon Brumfield's motion to suppress (Dkt. # 23) is **denied**.

**DATED** this 29th day of April, 2022.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE